IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------------------------------X
**STEVEN JENKINS,**

                          **Plaintiff,**

      v.

**NORTHEAST TREATMENT CENTERS, INC.;
TANYA JOHNSON (In Her Individual and
Official Capacity); JENNIFER HERMAN
(In Her Individual and Official Capacity);
ANN MARIE WEINBERG (In Her Individual
and Official Capacity); and DR. JULIA
MONICO (In Her Individual and Official
Capacity).**

                          **Defendants.**
------------------------------------------------------------------------X

Civil Action No.

COMPLAINT

Plaintiff, Steven Jenkins, by and through his attorneys, Derek Smith Law Group, PLLC, hereby bring the following claim that Defendants Northeast Treatment Center, Tanya Johnson, Jennifer Herman, and Ann Marie Weinberg, violated public policy by retaliating against Plaintiff for having exercised his rights and made a good faith report of wrongdoing and waste and in support thereof allege and aver:

## NATURE OF THE CASE

1. Plaintiff complains pursuant his rights to freedom of speech under the First Amendment of the Constitution of the United States, his Substantive and Procedural Due Process Rights, 42 U.S.C. § 1983, and his protection under the Pennsylvania Whistleblower Statute 43 P.S. § 1421-1428.

## JURISDICTION AND VENUE

2. This action involves a Deprivation of Rights of a citizen, by a state actor, protected under

the Due Process Clause of the Fourteenth Amendment involving a Deprivation of Rights under the First and Fourteenth Amendments as well as a question of federal law under the First and Fourteenth Amendments of the United States Constitution.

3. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331 because it involves questions under federal law under 42 U.S. § 1983, the First, and Fourteenth Amendment.

4. Supplemental Jurisdiction over Plaintiff's 43 P.S. § 1423 claim is proper under 28 U.S.C. § 1367 because that claim derives from a common nucleus of operative facts.

5. Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3) because substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in Philadelphia County, Pennsylvania within the Eastern District of Pennsylvania, and Defendants are subjected to personal jurisdiction here.

## PARTIES

6. Plaintiff Steven Jenkins (hereinafter referred to as "Plaintiff") is an individual male who is a resident of the Commonwealth of Pennsylvania.

7. Defendant Northeast Treatment Centers, Inc. (hereinafter referred to as "Defendant NET") is a corporation existing under the existing law of the Commonwealth of Pennsylvania.

8. At all times material, Defendant NET was and still is headquartered at 499 N. 5th St., Suite A, Philadelphia, PA 19123.

9. At all times material, Defendant NET is a drug treatment facility.

10. At all times material, Defendant NET received state and federal funding.

11. At all times material, Defendant Tanya Johnson (Hereinafter referred to as "Defendant

Johnson") was and still is employed by Defendant NET.

12. At all times material, Defendant Johnson held a supervisory position over Plaintiff.

13. At all times material, Defendant Jennifer Herman (Hereinafter referred to as "Defendant Herman") was and still is employed by Defendant NET.

14. At all times material, Defendant Herman held a supervisory position over Plaintiff.

15. At all times material, Defendant Ann Marie Weinberg (Hereinafter referred to as "Defendant Weinberg") was and still is employed by Defendant NET.

16. At all times material, Defendant Weinberg held a supervisory position over Plaintiff.

17. At all times material, Defendant Dr. Julia Monico (Hereinafter referred to as "Defendant Monico") was employed by and still is employed by Defendant NET as detailed in the facts below.

18. At all times material, Defendant Monico held a supervisory position over Plaintiff.

19. At all times material, Defendants were joint employers of Plaintiff.

## MATERIAL FACTS

20. In or around August 2019, Plaintiff was hired by Defendant NET as a Behavioral Health Associate ("BHA").

21. In or around January of 2020, Plaintiff noticed an error in the rate of pay he received.

22. Upon information and belief, Defendant NET paid employees hazard pay due to the novel COVID-19 virus.

23. However, Defendant NET failed to pay employees hazard pay on any overtime hours.

24. Plaintiff reported this issue to his supervisors.

25. Plaintiff also reached out to the Pennsylvania Department Labor and Industry's Labor

     Relations.

26. Plaintiff sought their guidance on what he should do in regard to his concern related to his COVID-19 hazard pay.

27. Plaintiff completed paperwork as instructed by Labor Relations.

28. Subsequently, Plaintiff exchanged a series of emails with the Defendant NET's Director of Payroll, Defendant Weinberg.

29. Defendant Weinberg informed Plaintiff that it was "upper management," who needed to address his concerns and that he should, "take [his concerns] to the Vice President."

30. Plaintiff emailed Defendant Herman, Defendant NET's Vice President.

31. Defendant Herman scheduled a telephone call with Plaintiff.

32. During that call, Defendant Herman informed Plaintiff that the issue was, "bigger than [him]."

33. Plaintiff's concerns were not addressed any further.

34. Shortly thereafter, a mass email was sent to all employees informing them that there had been a clerical error and that all employees would be receiving retroactive hazard pay for overtime hours worked during the pandemic.

35. Almost immediately thereafter, Defendants began disproportionally writing Plaintiff up.

36. In or around February 2020, Plaintiff reported to work to cover a shift he was not previously scheduled for.

37. Defendant NET's scheduler, Shirley Last Name Unknown, had called Plaintiff and asked him to cover a lobby shift from 3 PM-11 PM.

38. Plaintiff agreed and reported in as requested.

39. When he arrived Nurse Jennifer Roth/Ruth approached Plaintiff and informed him that he

needed to drive a patient to Eagleville.

40. As Plaintiff had just completed a sixteen (16) hour shift he felt unsafe driving a two (2) hour round trip.

41. Plaintiff informed Nurse Roth/Ruth as much.

42. Nurse Roth/Ruth informed Defendant Johnson of the issue.

43. Defendant Johnson informed Plaintiff if he did not wish to complete his duties he should have not agreed to work and that he could clock out and go home.

44. Plaintiff explained that the scheduler had informed him it was a lobby shift, hence why he agreed to take the shift.

45. Defendant Johnson, unhappy with Plaintiff's response, informed him that he was, "suspended."

46. Plaintiff clocked out and went home.

47. Upon arriving home, Plaintiff already had an email stating that he was suspended until Tuesday.

48. Plaintiff, distressed by Defendants' actions and believing it was in retaliation for his reports of Defendant NET's violations of the FFCRA, emailed Defendant Herman.

49. Defendant Herman replied that they would talk Monday or Tuesday.

50. Defendant Herman and Plaintiff subsequently spoke on the phone.

51. During that call Defendant Herman informed Plaintiff that Defendant Johnson had informed her that Plaintiff, during the interaction described above, had stated, "I'm not working."

52. Plaintiff informed Defendant Herman that this was untrue.

53. As a result of Defendant Herman and Plaintiff's phone call, Defendant Herman agreed to

take the suspension off his record and remove the write up from Plaintiff's personnel file.

54. However, as result of Defendants' actions, Plaintiff felt humiliated, embarrassed, distressed, and lost more than sixteen (16) hours of overtime.

55. As a result, Plaintiff made a report of harassment and abuse of power to Defendant NET's Human Resources Department (hereinafter "HR") with regard to Defendant Johnson.

56. Plaintiff informed HR that he felt uncomfortable working with Defendant Johnson as she had fabricated a story to substantiate a fraudulent write up.

57. Plaintiff also sent an email memorializing the same.

58. Shortly thereafter, the HR Director reached out to Plaintiff via email and scheduled an in-person meeting with him, Defendant Johnson, and herself.

59. Plaintiff participated in an in-person meeting with Defendant Johnson and Defendant NET's HR Director.

60. During the meeting Defendant Johnson became angry and was very curt with Plaintiff.

61. At one point, Defendant Johnson stated, "when you become a director you can question how NET and supervisors do things."

62. Defendant Johnson's behavior at the meeting, or prior to the meeting, was not addressed.

63. It was agreed the Plaintiff would not have to report to Defendant Johnson moving forward.

64. In or around March or April 2020, Defendant Monico was hired.

65. In or around April or May, Plaintiff told Defendant that he was exposed to a patient/client who had tested positive for COVID-19.

66. Plaintiff was tested and put out of work for two weeks for test results and quarantine.

67. During that time, Plaintiff's test came back negative, but he was still out due to the incubation period.

68. Following a negative COVID-19 test result, Plaintiff returned to work immediately.

69. Shortly thereafter, Plaintiff was written up for the second time.

70. At this time, Plaintiff was working seven to eight straight days due to Defendant NET being understaffed.

71. Specifically, Defendants often asked Plaintiff to cover shifts on his schedule days off.

72. Physically and mentally drained, Plaintiff began using his sick time.

73. Defendants, however, would not deduct a sick day off his balance. Rather, Defendants would manipulate his, "hours worked."

74. This resulted in Plaintiff being paid less than if they would have correctly deducted his sick time due to the amount of overtime he would have clocked for the week.

75. Defendants claimed that Plaintiff was manipulating time. However, Plaintiff's reporting of the time was accurate.

76. Defendant Johnson and Defendant Monico administered the write-up to Plaintiff.

77. Plaintiff disagreed with the write-up and refused to sign it.

78. Plaintiff's request for a copy of the write-up was denied.

79. Defendants' second write-up of Plaintiff was in retaliation for his earlier reports of unlawful acts by Defendants and in an effort to prevent him from reporting improper pay thus resulting in restorative pay to other Defendant NET employees.

80. In August 2020, Defendant switched their policy and began applying employees sick, administrative, and vacation time for missed work due to COVID-19 regardless of if their exposure occurred at Defendant NET.

81. In or around November or December 2020, Defendant Johnson and Defendant Monico informed Defendant NET employees that due to COVID-19 potential patients of Defendant

NET were no longer permitted to stay outside on the property overnight.

82. Only if space was available in the unit or there was an empty chair in the lobby were they permitted to stay "overnight."

83. Plaintiff attempted to enforce this policy by instructing potential patients waiting outside that they could not remain on grounds overnight.

84. Plaintiff further informed them that they should seek medical treatment and or housing elsewhere including other drug rehabs or nearby hospitals. Plaintiff would name the nearby hospitals.

85. Plaintiff also, on numerous occasions, asked security to assist him in informing the potential patients, who were often under the influence of a mind impairing substance.

86. Upon information and belief, security assisted, to the best of their ability, because they were also informed of this policy.

87. Shortly after the policy, "went into effect," Plaintiff was informed that a patient had called Community Behavioral Health (hereinafter "CBH"), an organization the Defendant NET works closely with.

88. Upon information and belief, the patient informed CBH that a bald black male in the lobby was turning them away.

89. As a result, Defendants wrote Plaintiff up for, "violating policy."

90. Plaintiff, during the in-person administration of the write-up, reminded Defendant Johnson and Defendant Monico that they had instructed him that this was the new policy.

91. Defendants had no response.

92. Accordingly, Plaintiff refused to sign the write-up.

93. Plaintiff requested a copy of the write-up, but Defendants refused to give him a copy.

94. In or around the first week of December 2020, Defendant Johnson sent out an email that informed Defendant NET staff that the lobby capacity would be increasing from six (6) back to eight (8).

95. Due to the size of the lobby, it would be impossible for social distancing to be followed if this increase were permitted.

96. Plaintiff's shifts were often lobby shifts during which he was required to walk through the lobby to hand out and collect paperwork.

97. Plaintiff felt unsafe and had serious concerns for his physical health and safety.

98. This increase in capacity and inability to safely social distance caused Plaintiff significant concerns and distress.

99. Additionally, Plaintiff, due to the policy implemented in August 2020 concerning pay for COVID-19 leave, could not afford to increase his risk of exposure.

100. As such, Plaintiff, located the applicable CDC guidelines and emailed them to Defendant Herman voicing his concerns.

101. Shortly thereafter, Defendants revoked their statement concerning the increase in the lobby capacity and allowed it to remain at six (6) patients.

102. Since the onset of the pandemic, typically only one nurse was scheduled to work during Plaintiff's shifts.

103. On December 25, 2020, Defendant Monico contacted Plaintiff and asked if he could come in for an early shift Plaintiff was not previously scheduled for or expected to work.

104. Plaintiff informed Defendant Monico that he was not scheduled and could not come in early to work.

105. Plaintiff also informed Defendant Monico that his brother had just passed away.

106. Defendant Monico made no mention of bereavement leave.

107. In or around, Saturday, December 26, 2020, Plaintiff's brother was laid to rest.

108. Despite his loss, Plaintiff worked the evening of his brother's funeral.

109. Plaintiff also worked following Sunday and Monday, respectively December 27 and 28, 2020, as he knew Defendant NET was short staffed.

110. Plaintiff was schedule for the 11:00 PM to 7:00 AM shift for Monday.

111. Plaintiff, however agreed to work at 7:00 PM at Defendant Monico's request.

112. Typically, breaks are taken whenever they can be due to the unpredictable patient intakes.

113. On or around Monday, December 28, 2020, Plaintiff, due to staffing and the patient's transports he would need to do, took his break between two patient transports.

114. Despite being on break, Plaintiff was doing laundry, a task of his job.

115. Plaintiff then began to experience unexpected grief thinking about his brother's passing, whereupon he began crying and needed a moment to gather his composure.

116. Plaintiff stepped away and sat down in a dark room.

117. Pat Last Name Unknown entered the room and observed Plaintiff.  Plaintiff then asked, "can I help you," to which Pat responded "no."

118. Upon information and belief, after this encounter, Pat informed management that Plaintiff was sleeping on the job.

119. Defendant Johnson called Plaintiff on the unit phone and claimed that people were looking for Plaintiff, however, Nurses Peggy and Pearl were aware of Plaintiff's whereabouts.

120. Upon information and belief, Defendant Johnson has access to the unit cameras

from her home which made it possible for her to see employees enter and leave the room, however, not what occurs in the room.

121. Upon information and belief, this upset Nurse Peggy because was she aware of Plaintiff's location.

122. Upon information and belief, Nurse Peggy contacted Defendant Johnson to inform her that Plaintiff's whereabouts were in fact known and that Pat misrepresented Plaintiff's absence.

123. At the start of Plaintiff's tenure, there were two BHAs, two to three nurses, and a care coordinator.

124. They eventually eliminated the care coordinator position and divided the tasks between medical assistant and BHAs.

125. BHAs were meant to handle biohazardous waste which they never received training for.

126. On or around Wednesday, December 30, 2020, Plaintiff went in for an 11:00 PM shift.

127. Plaintiff attempted to use his key fob to access different points in the building but was unable to do so.

128. Plaintiff attempted to access one of Defendant NET's programs necessary for completing his duties and responsibilities. However, he was unable to access the program.

129. Plaintiff also lost access to his email except for one email from Donna Holland making sure his key fob access was revoked.

130. Plaintiff called Defendant Monico to report the issues with his key fob and access to systems and programs.

131. Plaintiff, suspicious, asked if he was being fired.

132. Defendant Monico informed Plaintiff she would "take care of it in the morning."

133. Plaintiff then received an email from Donna Holland which discussed ensuring that Plaintiff's access was revoked, and key fob obtained.

134. Upon information and belief, this email was sent prematurely.

135. Plaintiff sent Defendant Monico a text of a screenshot of the email.

136. Plaintiff worked until 7:00 AM on December 31, 2020.

137. Plaintiff was terminated at the conclusion of his shift.

138. Plaintiff gathered his belongings and asked Defendant Johnson if she wanted him to return them.

139. Defendant Johnson replied that they would meet with Defendant Monico in the conference room whereupon Plaintiff could return his things.

140. Defendant Johnson, Defendant Monico, and Plaintiff gathered in the conference room where Defendants notified Plaintiff that he was indeed fired for sleeping and had to return both his badge and key fob.

141. Furthermore, both Defendants informed Plaintiff that the reason for his termination was a combination of reasons and that Plaintiff's services were no longer needed.

142. Plaintiff requested a termination letter and Defendant informed Plaintiff he would need to contact HR.

143. Plaintiff, shortly after being terminated, emailed HR requesting a termination letter or documentation related to his termination.

144. Plaintiff has received no response.

145. On January 6, 2021, Plaintiff sent an email to Defendant Herman requesting a copy

of his termination letter.

146. On January 7, 2021, Plaintiff received a paycheck for all hours worked.

147. To date, Plaintiff has not been paid for his accrued sick, vacation, or administrative time.

148. Upon information and belief, Defendants have failed to pay Plaintiff for such time in retaliation for his reporting and opposition to their unlawful behavior.

149. That as a result of Defendants' conduct and comments, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

150. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and' emotionally distressed.

151. As a result of the acts and conduct complaint of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

152. Plaintiff has further experienced and continues to experience severe emotional and physical distress.

153. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

154. Plaintiff claims that Defendants' unlawfully discriminated against Plaintiff because of his race, and because he complained or opposed the unlawful conduct of Defendants related to the above protected classes.

155. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against the Defendants.

156. Plaintiff claims a continuous practice of discrimination and claims continuing violations and makes all claims herein under the continuing violations doctrine.

157. Plaintiff further claims constructive and/or actual discharge to the extent Plaintiff is terminated from Plaintiff's position as a result of the unlawful discrimination and retaliation.

158. Should Plaintiff be unlawfully terminated Plaintiff seeks reinstatement.

159. The above are just some examples of some of the unlawful discrimination and retaliation to which Defendants subjected Plaintiff on a continuous and on-going basis throughout Plaintiff's employment.

160. The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

161. Plaintiff claims alternatively that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for contin conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant owed and breach its duty to Plaintiff to prevent the harassment, discrimination and retaliation and is liable therefore for negligence.

## FIRST CAUSE OF ACTION
## VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS
## UNDER THE FOURTEENTH AND FIRST AMENDMENTS
## OF THE UNITED STATES CONSTITUTION
**(against all Defendants)**

162. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint

163. Plaintiff engaged in protected speech each and every time he reported purported unlawful conduct on the part of Defendants.

164. Plaintiff's reports of purported unlawful conduct included Defendants' violations of 29 U.S.C. §§ 201 et. seq., 43 PS 260.1 et. seq., and/or The Act of May 29, 2020 (Act 2A of 2020), known as the COVID-19 Emergency Supplement to the General Appropriation Act of 2019 in or around January 2020.

165. In or around December 2020, Plaintiff also opposed and reported Defendants purported violations of the CDC's guidelines related to COVID-19 and Pennsylvania Govern Wolf's Executive Order related to COVID-19.

166. At all times, Defendants violated Plaintiff's First Amendment Rights to Freedom of speech when they retaliated against him for reporting the unlawful conduct to the Department of Labor.

167. At all times, Defendants violated Plaintiff's First Amendment Rights to Freedom of speech when they terminated him for reporting the unlawful conduct to his supervisors and Defendants' HR Department.

168. Plaintiff claims Defendants violated 42 U.S.C. § 1983, which states in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected,

any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

169. The Fourteenth Amendment of the United States Constitution states in relevant part that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

170. Plaintiff's first cause of action arises under Substantive Due Process protection of the Fourteenth Amendment, which protects citizens from state action in violation of the protected speech under the First Amendment of the United States Constitution.

171. As Defendant NET received Federal and State funding, Defendant NET is state actor.

172. The policy and procedures of Defendants, acting under the color of state law, facially violated the First Amendment of the United States Constitution by retaliating against Plaintiff for his reports to a state regulatory agency.

173. Actions taken by Defendants against Plaintiff violate the protection afforded by the First Amendment of the United States Constitution because it conditions employment on

acceptance of content and viewpoint restrictions on otherwise available, protected free speech. The directives of the Defendants unconstitutionally burden the rights of Plaintiff to communicate his protected interest

174. Defendants' policies and procedures are not narrowly tailored to serve any compelling government interest

175. Defendants' policies and procedures are not narrowly tailored to serve a significant government interest.

176. Plaintiff makes claims for all damages he suffered as a result of having his freedom of speech.

## SECOND CAUSE OF ACTION
## 43 P.S. § 1423
## PENNSYLVANIA WHISTLEBLOWER RETALIATION
### (against all Defendants)

177. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

178. The PWL provides, "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423(a).

179. "Wrongdoing includes not only violations of statutes or regulations that are of the

type that the employer is charged to enforce, but violations of any federal or state statute or regulation." Golaschevsky v. Dep't of Envtl. Protection, 554 Pa. 157, 162 (1998) citing 43 P.S. § 1422.

180. In order to make out a retaliation case under the PWL, a plaintiff must plead: (1) wrongdoing and (2) a causal connection between the report of wrongdoing and adverse employment action. McAndrew v. Bucks County Bd. Of Com'rs, 982 F. Supp. 2d 491, 503 (E.D. Pa. 2013).

181. In analyzing whether the motive for an adverse employment action is retaliatory, courts have looked at two factors: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." Hussein v. UPMC Mercy Hosp., 466 Fed. Appx. 108, 112 (3d Cir. 2012).

182. Plaintiff reasonably believed Defendant violated 29 U.S.C. §§ 201 et. seq., 43 PS 260.1 et. seq., and/or The Act of May 29, 2020 (Act 2A of 2020), known as the COVID-19 Emergency Supplement to the General Appropriation Act of 2019 in or around January 2020 and that Defendants' acts constituted a waste of public funds.

183. Furthermore, Plaintiff reasonably believed, in or around December 2020, Defendants violated the CDC's guidelines related to COVID-19 and Pennsylvania Govern Wolf's Executive Order related to COVID-19.

184. Plaintiff "blew the whistle" when he objected to the conduct and reported it directly to the Department of Labor and his superiors both verbally and in writing.

185. Defendants retaliated against Plaintiff due to his knowledge of and opposition to the wrongful activity.

**186.** Plaintiff will rely on a broad array of evidence to demonstrate a causal link between his protected activity and Defendants' actions taken against him, such as the unusually-suggestive proximity in time between events, as well as Defendants' antagonism and change in demeanor toward Plaintiff after Defendant became aware of his protected activity.

**187.** As a result of Defendants' violations of the PWL, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## JURY DEMAND

Plaintiff Jenkins requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the 42 U.S.C. § 1983, the Frist and Fourteenth Amendment of the United States Constitution, and PWL.

Dated: March 25, 2021        **DEREK SMITH LAW GROUP, PLLC**

*Attorneys for Plaintiff*

By: _/s/ Catherine W. Smith, Esq._
Catherine W Smith, Esquire
1835 Market Street, Suite 2950
Philadelphia, Pennsylvania 19103
catherine@dereksmithlaw.com