```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN JENKINS,                      :    CIVIL ACTION
                                     :    NO. 21-1421
          Plaintiff,                 :
     v.                              :
                                     :
NORTHEAST TREATMENT CENTERS,         :
INC., et al.,                        :
                                     :
          Defendants.                :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                            November 10, 2021

## I. INTRODUCTION

Plaintiff Steven Jenkins ("Plaintiff") brings this action against Northeast Treatment Centers, Inc. ("NET"), his former employer, and four former supervisors, Tanya Johnson, Ann Marie Weinberg, Julia Monaco, and Jennifer Hermann (the "Individual Defendants"). NET and the Individual Defendants are hereinafter collectively referred to as "Defendants."

Plaintiff alleges he was unlawfully terminated and retaliated against by Defendants for reporting unlawful pay practices and safety violations related to the COVID-19 pandemic. His Second Amended Complaint asserts three counts: (1) Violations under 42 U.S.C. § 1983 of substantive due process rights under the First Amendment (as incorporated through the Fourteenth Amendment); (2) Retaliation under the Fair Labor

1

Standards Act ("FLSA"); and (3) Violations of Pennsylvania's Whistleblower Law.

All Defendants except Monaco filed a Motion to Dismiss for failure to state a claim, and Monaco later filed a Motion to Dismiss joining in the other Defendants' motion. Thus, the Court will refer to this motion as the collective Defendants' Motion to Dismiss.

For the reasons explained below, the Court will dismiss Count I with prejudice and dismiss Counts II and III without prejudice.

## II.  FACTUAL BACKGROUND[1]

Defendant NET is a Community Umbrella Agency ("CUA") which provides a behavioral health and social services including mental health services, addiction treatment, foster care, residential group care, adoption, juvenile justice services, and child welfare services. In August 2019, NET hired Plaintiff as a Behavioral Health Associate ("BHA"). In January 2020, Plaintiff noticed an error in the rate of pay he received. NET paid employees hazard pay due to COVID-19, but it failed to pay employees hazard pay on any overtime hours. Plaintiff reported this issue to his supervisors. He also reported it to the Pennsylvania Department of Labor and Industry.

---

[1]  The facts herein are taken from Plaintiff's Second Amended Complaint and are accepted as true and viewed in the light most favorable to Plaintiff.

Subsequently, Plaintiff exchanged a series of emails with NET's Director of Payroll, Defendant Weinberg. Weinberg informed Plaintiff that it was "upper management" who needed to address his concerns and that he should "take [his concerns] to the Vice President." Sec. Am. Compl. ¶ 39, ECF No. 26 (alteration in original). Plaintiff then scheduled a telephone call with Defendant Hermann, NET's Vice President. During that call, Hermann informed Plaintiff that the issue was "bigger than [him]." Id. at ¶ 42 (alteration in original).

Shortly thereafter, a mass email was sent to all employees informing them that there had been a clerical error and that all employees would be receiving retroactive hazard pay for overtime hours worked during the pandemic. Almost immediately thereafter, Defendants[2] allegedly began disproportionately writing Plaintiff up.

In February 2020, Plaintiff reported to work to cover a shift for which he was not previously scheduled. NET's Scheduler, Shirley, had called Plaintiff and asked him to cover a lobby shift from 3-11 p.m. Plaintiff agreed and came in. When he arrived, Nurse Jennifer approached Plaintiff and informed him that he needed to drive a patient to Eagleville, another

---

[2] The vague references to collective "Defendants" herein are taken directly from the allegations in Plaintiff's Second Amended Complaint. Should Plaintiff elect to file a third amended complaint, he is cautioned to specify which defendant performed each act he relies upon to state his claims.

3

facility operated by Defendant NET. Plaintiff informed Nurse Jennifer that he had just completed a sixteen-hour shift and felt unsafe driving two hours round trip.

Nurse Jennifer informed Defendant Johnson of the issue, who informed Plaintiff that if he did not wish to complete his duties, he should not have agreed to work and that he could clock out and go home. Plaintiff explained that the Scheduler informed him it was a lobby shift, which is why he agreed to come in. Johnson was unhappy with this response and informed Plaintiff that he was suspended. Plaintiff clocked out and went home. Upon arriving home, Plaintiff found an email stating that he was suspended until Tuesday.

Plaintiff emailed Hermann, who subsequently called Plaintiff. Hermann said Johnson told her that Plaintiff stated "I'm not working" during the interaction described above. Plaintiff stated this was untrue. Hermann agreed to take the suspension off Plaintiff's record and remove the write-up from Plaintiff's personnel file. However, Plaintiff still felt humiliated and distressed and lost more than sixteen hours of overtime.

Plaintiff made a report of harassment and abuse of power to NET's Human Resources Department ("HR") regarding Johnson. Plaintiff informed HR that he felt uncomfortable working with Johnson as she had fabricated a story to substantiate a

4

fraudulent write-up. Shortly thereafter, HR scheduled an in-person meeting between Plaintiff, Johnson, and HR. During the meeting, Johnson allegedly became angry and was very curt with Plaintiff. During the meeting, Johnson told Plaintiff that "when you become a director you can question how NET and supervisors do things." Id. at ¶ 71. Johnson's behavior during or prior to the meeting was not addressed, but the parties agreed that Plaintiff would not have to report to Johnson moving forward.

In April or May, Plaintiff found out he was exposed to a patient/client who had tested positive for COVID-19. Plaintiff was tested and had to remain out of work for two weeks for test results and quarantine. During that time, Plaintiff's test came back negative, but he remained out due to the incubation period. Following another negative test result, Plaintiff returned to work immediately.

Shortly thereafter, Plaintiff was written up for the second time. At that time, Plaintiff was working seven to eight days straight due to understaffing issues. Specifically, Defendants often asked Plaintiff to cover shifts on his scheduled days off. Plaintiff was physically and mentally drained and began using his sick time. However, Defendants would not deduct a sick day from his balance. Rather, they would manipulate Plaintiff's "hours worked." Id. at ¶ 83. This resulted in Plaintiff being

5

paid less than if they had correctly deducted his sick time due to the amount of overtime he would have clocked for the week.

Defendants claimed that Plaintiff was manipulating time, but Plaintiff claims his reporting was accurate. Defendants Johnson and Monaco administered a write-up to Plaintiff, who disagreed with the write-up and refused to sign it. Plaintiff's request for a copy of the write-up was denied. Plaintiff claims that this second write-up was in retaliation for his earlier reports of unlawful acts by Defendants and in an effort to prevent him from reporting improper pay.

In November or December 2020, Johnson and Monaco informed NET employees that due to COVID-19, potential patients of NET were no longer permitted to stay outside on the property overnight. They could only stay overnight if space was available in the unit or there was an empty chair in the lobby. Plaintiff attempted to enforce this policy by instructing potential patients waiting outside that they could not remain on the grounds overnight. Plaintiff further informed them that they should seek medical treatment and/or housing elsewhere, including other drug rehabs or nearby hospitals.

On numerous occasions, Plaintiff also asked security to assist him in informing the potential patients, who were often under the influence of a mind-impairing substance. Shortly after the policy went into effect, Plaintiff was informed that a

6

patient called Community Behavioral Health (an organization with which NET works closely) to inform them that a bald black male in the lobby was turning them away. As a result, Defendants wrote Plaintiff up for "violating policy." Id. at ¶ 99.

During the in-person administration of the write-up, Plaintiff reminded Johnson and Monaco that they instructed him that this was the new policy. Johnson and Monaco had no response. Plaintiff refused to sign the write-up and requested a copy of it, but Defendants refused to give him one.

In the first week of December 2020, Johnson sent an email informing NET staff that the lobby capacity would be increasing from six to eight. Due to the size of the lobby, Plaintiff alleges the increase in capacity would make social distancing impossible. Plaintiff's shifts were often lobby shifts during which he was required to walk through the lobby to hand out and collect paperwork. Plaintiff felt unsafe and was concerned for his physical health and safety. Plaintiff located the applicable CDC guidelines and emailed them to Hermann, voicing his concerns. Shortly thereafter, Defendants revoked their statement concerning the capacity increase and allowed it to remain at six patients.

On December 25, 2020, Monaco contacted Plaintiff and asked if he could come in for an early shift for which he was not previously scheduled. Plaintiff informed Monaco that his brother

7

had just passed away and he was not scheduled and could not come in early. However, Plaintiff did work during the evening on the next day, December 26, right after his brother's funeral. He also worked on December 27. Plaintiff was also scheduled to work the day after that, on December 28, from 11:00 P.M. to 7:00 A.M., but he agreed to come in early at 7:00 P.M. at Monaco's request.

On December 28, Plaintiff came to work and took a break between two patient transports. Typically, breaks are taken whenever they can be due to unpredictable patient intakes. Despite being on break, Plaintiff was doing laundry, one of his job duties. Plaintiff then began to experience unexpected grief over his brother's passing, and he began crying and needed a moment to gather his composure. Plaintiff stepped away and sat in a dark room. An employee named Pat entered the room and observed Plaintiff. Plaintiff asked "can I help you," to which Pat responded, "no." Id. at ¶ 127.

After this encounter, Pat informed management that Plaintiff was sleeping on the job. Johnson called Plaintiff on the unit phone and claimed that people were looking for him. However, Nurses Peggy and Pearl were aware of Plaintiff's whereabouts. Nurse Peggy allegedly contacted Johnson to inform her that Plaintiff's whereabouts were in fact known and that Pat misrepresented Plaintiff's absence.

8

On December 30, 2020, Plaintiff went to work for an 11:00 P.M. shift. Plaintiff attempted to use his key fob to access different points in the building but was unable to do so. Plaintiff then attempted to access one of NET's programs necessary for completing his duties but was unable to access it.

Plaintiff called Monaco to report the issues with his key fob and access to programs. Plaintiff also asked if he was being fired. Monaco informed Plaintiff that she would "take care of it in the morning." Id. at ¶ 142. Plaintiff then received an email from Donna Holland which discussed ensuring that Plaintiff's access was revoked and that his key fob was returned. Plaintiff alleges that this email was sent prematurely. Plaintiff sent Monaco a screenshot of the email.

Plaintiff worked until 7:00 a.m. on December 31, 2020, and was then terminated at the end of his shift. Plaintiff gathered his belongings and asked Johnson if she wanted him to return them. Johnson replied that they would meet with Monaco in the conference room, where Plaintiff could return his things. Johnson and Monaco then met with Plaintiff in the conference room and notified him that he was fired for sleeping and had to return both his badge and key fob. They stated that there were a number of reasons for his termination and that his services were no longer needed. Plaintiff requested a termination letter and was told to contact HR.

Shortly after being terminated, Plaintiff emailed HR to request a termination letter, but never received a response. On January 6, 2021, Plaintiff emailed Hermann to request a termination letter. The next day, Plaintiff received a paycheck for all hours worked. However, Plaintiff was never paid for his accrued sick, vacation, or administrative time. Plaintiff alleges that Defendants failed to pay Plaintiff for such time in retaliation for his reporting and opposition to their unlawful behavior.

Based on these factual allegations, Plaintiff filed the present action alleging violations of (1) 42 U.S.C. § 1983 under the First Amendment (through the incorporation doctrine), and (2) Pennsylvania's Whistleblower Law. After motions to dismiss were filed by all defendants (ECF Nos. 15, 16), the Court dismissed Count I with leave to amend and took Count II under advisement. Plaintiff then filed a Second Amended Complaint, this time with an added claim for retaliation under the FLSA. Defendants then filed the pending motions to dismiss. These motions are now before the Court.

### III. LEGAL STANDARD

A party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering such a motion, the Court must "accept as true all allegations in the complaint and all reasonable

10

inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." DeBenedictis v. Merrill Lynch & Co., 492 F.3d 209, 215 (3d Cir. 2007) (quoting Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)).

To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. Although a plaintiff is entitled to all reasonable inferences from the facts alleged, a plaintiff's legal conclusions are not entitled to deference, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

The pleadings must contain sufficient factual allegations so as to state a facially plausible claim for relief. See, e.g., Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In deciding a Rule 12(b)(6) motion, the

Court limits its inquiry to the facts alleged in the complaint and its attachments, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

**IV. DISCUSSION**

    **a. Count I: First Amendment Claim Under 42 U.S.C. § 1983**

        **i.** **Defendant NET**

Defendants argue that Count I should be dismissed as to NET because the Second Amended Complaint does not sufficiently allege that NET is a state actor. The Second Amended Complaint alleges that NET receives a substantial portion of its total revenue from public funds, that NET is a Community Umbrella Agency ("CUA") within the city of Philadelphia, and that it provides a number of social services including substance abuse treatment, mental health treatment, foster care and adoption services, and residential group care, that it alleges have traditionally been a function of the state. Sec. Am. Compl. ¶¶ 19-30, ECF No. 26.

A private party is a state actor for the purposes of a § 1983 action when "the actor is so integrally related to the state that it is fair to impute to the state responsibility for

the action." Leshko v. Servis, 423 F.3d 337, 340 (3d Cir. 2005). Plaintiffs seeking to establish state action on the part of a private party must show that the *specific action* that gave rise to the claim is influenced, encouraged, or jointly participated in by the State. Cf. Leshko, 423 F.3d at 341 ("[Plaintiff] does not allege that Pennsylvania forced or encouraged, or jointly participated in, [Defendants'] negligent behavior, and therefore she states no claim of state action on the basis of regulation and funding.").

To further clarify the line between state and private actors, the Third Circuit recognizes three broad tests to determine when state action exists: (1) whether the private actor has exercised "powers that are traditionally the exclusive prerogative of the state" (the "public function test"); (2) whether the private actor has acted "in concert with state officials" (the "close nexus test"); and (3) whether the State has "so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity" (the "symbiotic relationship test"). Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009).

Because Plaintiff does not allege that the State acted in concert with Defendants, he seems to rely exclusively on the "public function" and "symbiotic relationship" tests. For the

13

reasons set forth below, he fails to sufficiently allege state action under either test.

### 1.  Public Function Test

The Second Amended Complaint does not allege that Defendant NET performed any function that is exclusively the province of the state. See Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995) ("The [Third Circuit] came increasingly to emphasize the 'exclusivity' aspect of the test, and rarely found that plaintiffs had met that rigorous standard."). On the contrary, the functions that Plaintiff alleges NET performs have nearly all been found to be non-public functions by courts within this Circuit. See Allah v. O'Conner, No. CV 18-4048, 2020 WL 5408066, at *4 (E.D. Pa. Sept. 9, 2020) ("[S]ubstance abuse and mental health treatment is not traditionally the exclusive prerogative of the state."); Leshko, 423 F.3d at 347 (3d Cir. 2005) (holding that foster parents are not state actors for the purposes of liability under § 1983); Schutt v. Melmark, Inc., 186 F. Supp. 3d 366, 373 (E.D. Pa. 2016) (dismissing a § 1983 claim because the plaintiff failed to allege any facts suggesting that providing custody and care services to intellectually disabled citizens is a traditional and exclusive government function in Pennsylvania). Because Plaintiff has not alleged any NET function that is exclusive to the state, the public function test does not help him.

14

### 2. Symbiotic Relationship Test

Plaintiff also argues that NET is a state actor because it receives substantial state funding, is subject to significant government regulation, and "perform[s] a function delegated by the state under the City of Philadelphia's Community Umbrella Agency ("CUA") program." Pl's. Resp. Opp'n Defs.' Mot. Dismiss 8-9, ECF No. 32.

However, "[t]he Third Circuit has explicitly held over the last two decades that private entities do not transform into state actors under § 1983 simply because they may receive extensive government regulation and funding." Egli v. Chester Cnty. Libr. Sys., 394 F. Supp. 3d 497, 505 (E.D. Pa. 2019) (first citing Gross v. R.T. Reynolds, Inc., 487 F. App'x 711, 719 (3d Cir. 2012); and then citing Crissman v. Dover Downs Ent., Inc., 289 F.3d 231, 244 (3d Cir. 2002)). Furthermore, a plaintiff cannot satisfy the symbiotic relationship test by simply asserting that the private actor performs duties delegated by the state; the question is whether the court "deem[s] the state's fingerprints to have been on" the specific action giving rise to the complaint. See Leshko, 423 F.3d at 340-41 (finding that defendants performed duties delegated by the state were not state actors because there was no allegation that the state participated in or encouraged the challenged action). Nowhere in the Second Amended Complaint does Plaintiff

15

allege that the state influenced or encouraged NET's specific actions against him. Accordingly, he cannot establish that NET is a state actor for the purposes of his § 1983 claim.

### ii. Individual Defendants

Defendants argue that Count I should also be dismissed as to the Individual Defendants because the Second Amended Complaint alleges no facts as to them or how their actions were undertaken under color of law. Plaintiff's Second Amended Complaint alleges the following specific acts by the Individual Defendants:

(1) Hermann wrote Plaintiff up after he opposed Defendant's violations of the FLSA (Sec. Am. Compl. ¶¶ 33-34, 36-37, 44-45, 55, ECF No. 26);
(2) The Individual Defendants wrote him up for "violating policy" (Id. at ¶¶ 91-99);
(3) Defendants Johnson and Monaco had informed him of the new policy that he was written up for enforcing (Id. at ¶¶ 99-101); and
(4) Defendants Weinberger and Hermann received his complaints of the overtime hazard pay wage violations (Id. at ¶¶ 33-34, 40-42).

Plaintiff alleges that each of these actions from the individual defendants eventually culminated in his termination for the pretextual reason of sleeping on the job. Sec. Am. Compl. ¶¶ 147-50, ECF No 26. Plaintiff's memorandum in opposition asserts that the Individual Defendants' actions were under color of law because they were taken "in their official capacity as employees of Defendant NET, a state actor due to its delegatory relationship with the State, and the Individual Defendants used

their status against Plaintiff for his protected actions of reporting wage and CDC protocol violations." Pl's. Resp. Opp'n Defs.' Mot. Dismiss 32, ECF No. 32.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). Again, the inquiry requires the court to determine whether the actor is "so integrally related to the state that it is fair to impute to the state responsibility for the action." Leshko, 423 F.3d at 340.

The Second Amended Complaint again fails to establish that the Individual Defendants acted under color of law. As with his claim against NET, Plaintiff does not assert that the actions of the Individual Defendants were encouraged or even influenced by the state. And because Plaintiff cannot show that NET is a state actor, his assertion that the Individual Defendants acted under color of state law because they worked for NET is unconvincing.

As such, Count I is dismissed as to both NET and the Individual Defendants. Because this is the second time the Court has dismissed this claim, and Plaintiff again fails to allege

any facts to support his contention that Defendants acted under color of law, Count I will be dismissed with prejudice.

**B. Count II: Retaliation under the FLSA**

Count II of the Second Amended Complaint is a claim of improper retaliation in violation of the FLSA. The Court need not reach the merits of this claim, however, as Plaintiff added it to his Second Amended Complaint without requesting leave from the Court as required by Fed. R. Civ. P. 15.

Plaintiff argues that filing for leave "would have been a waste of judicial resources, would have caused undue delay and piecemeal litigation, could have delayed prompt and efficient resolution of the entire controversy between the parties, and could have resulted in prejudice to one or all parties." Pl's Resp. Opp. 11, ECF No. 32. He further argues that under Fed. R. Civ. P. 15(a)(2), which requires courts to "freely give leave when justice so requires," the Court would likely have granted his request for leave to file a Second Amended Complaint had he filed a request for leave.

Federal district courts have stricken or dismissed additional claims that were filed without leave of court. See, e.g., Waxman v. Equitable Life Assurance Soc'y of the United States, No. 08-60657-CIV, 2009 WL 10701022, at *3 (S.D. Fla. Sept. 29, 2009); Benton v. Baker Hughes, No. CV 12-07735 MMM MRWX, 2013 WL 3353636, at *3 (C.D. Cal. June 30, 2013); Jameson

18

Beach Prop. Owners Ass'n v. United States, No. 2:13-cv-01025-MCE-AC, 2014 WL 4925253, at *4-5 (E.D. Cal. Sept. 29, 2014). In other words, courts have found that a party may not grant itself leave to amend its complaint when under Rule 15 it is required that leave be obtained.

Because Plaintiff's claim was filed without leave of court, as required by Rule 15, it will be dismissed without prejudice. However, the Court shall grant Plaintiff leave to amend Count II of his Second Amended Complaint within thirty days.

### C. Count III: Pennsylvania Whistleblower Claim

As the Court only has supplemental jurisdiction over Count III because of Plaintiff's federal claims in Counts I and II, and because Count I will be dismissed with prejudice and Count II dismissed without prejudice, Count III is also dismissed without prejudice. Plaintiff will be granted leave to amend Count III within thirty days.

### V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be granted. Count I is dismissed with prejudice. Counts II and III are dismissed without prejudice. Plaintiff may file a third amended complaint reasserting Counts II and III within thirty days.

An appropriate order follows.